## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KAREN ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 14-662-SLR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Sommer L. Ross, Esquire, of Duane Morris, L.L.P., Wilmington, Delaware. Of Counsel: Eddy Pierre Pierre, Esquire, of the Law Offices of Harry J. Binder and Charles E. Binder, P.C., New York, New York. Counsel for Plaintiff.

Charles M. Oberly III, United States Attorney, Wilmington, Delaware and Patricia A. Stewart, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration. Of Counsel: Nora Koch, Esquire, Acting Regional Chief Counsel, Region III of the Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant.

## MEMORANDUM OPINION

Dated: October 5 , 2015
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Karen Robinson ("plaintiff") appeals from a decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("defendant"), denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act (the "Act") prior to August 1, 2012., 42 U.S.C. §§ 401-434, 1381-1383f. The court has jurisdiction pursuant to 42 U.S.C. § 405(g).[1]

Currently before the court are the parties' cross-motions for summary judgment. (D.I. 9, 13) For the reasons set forth below, plaintiff's motion will be denied and defendant's motion will be granted.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed an application for DIB and SSI on April 3, 2009, alleging disability beginning on January 25, 2009.[2] (D.I. 7-2 at 51-52) Plaintiff's claim was initially denied on January 8, 2010, and after reconsideration on March 9, 2010. (D.I. 7-5 at 2-6, 10-14) On April 1, 2011, after a hearing on December 10, 2010, the ALJ issued an unfavorable decision, finding plaintiff was not disabled under the Act for the relevant time period from June 2, 2008 to April 1, 2011. (D.I. 7-4 at 4-17) Plaintiff then filed a request for

---

[1] Under § 405(g), [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision. . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . . 42 U.S.C. § 405(g).

[2] Plaintiff amended her alleged onset date at the first hearing with Administrative Law Judge ("ALJ") Judith Showalter on December 20, 2010. (D.I. 7-2 at 52)

Appeals Council review as well as a new application for SSI and SSD. (*Id.* at 24-25) The Appeals Council granted plaintiff's request, remanded the matter back to the ALJ, and consolidated the new applications. (*Id.*) The ALJ held a second hearing on April 9, 2013. (D.I. 7-2 at 92-124) On June 24, 2013, the ALJ issued a partially unfavorable decision, finding plaintiff was not disabled before August 1, 2012 because she could perform a limited range of sedentary work. Plaintiff became disabled on this date. (*Id.* at 38) After an unsuccessful appeal to the Appeals Council, plaintiff appealed to this court for review of the June 24, 2013, decision. (*Id.* at 2)

## B. Medical History

### 1. Health history prior to relevant period

Plaintiff was born in 1963 and was 45 years old on her alleged onset date. (D.I. 7-2 at 58) She is considered a younger individual under 20 C.F.R. 404.1563(c). Plaintiff completed high school and has an Associate's degree in secretarial science. (*Id.* at 59) She has had an above-the-knee amputation on her right leg since infancy that she does not claim is disabling. (*Id.* at 56) Previous motor vehicle accidents have caused plaintiff injuries, requiring surgery on her cervical spine in both 2003 and 2005. (*Id.* at 65-67)

### 2. Health history during the relevant time period

On January 25, 2009, plaintiff's alleged onset date, plaintiff fell and injured her back and left shoulder, aggravating her previous spinal injuries. (D.I. 7-10 at 10) As a result, plaintiff visited St. Francis emergency room the next day and was treated for a

2

neck strain.[3] (*Id.*) On March 25, 2009, plaintiff's diagnoses remained cervical disc disease and rotator cuff syndrome, but she reported adequate pain management as a result of the prescribed medications. (*Id.*)

On May 6, 2009, plaintiff reported an acute onset of lower back pain which radiated down the left leg. (*Id.* at 7) A subsequent MRI done on May 11, 2009, revealed mild degenerative change, disc bulges most prominent at L3-4 and L4-5, and moderate central spinal stenosis and foramen narrowing at L3-4. (*Id.* at 2) The MRI did not reveal any disc herniation. (*Id.*) On June 2, 2009, spine specialist James Downing, M.D. ("Dr. Downing") examined plaintiff. (*Id.* at 25) He noted reduced motion in the cervical spine and an equivocal straight leg-raising test. (*Id.* at 26) Dr. Downing recommended "involving the patient in a brief course of physical therapy." (*Id.*) On a follow-up visit with plaintiff's primary care physician on June 6, 2009, plaintiff reported some days of pain, being able to tolerate sitting and standing for twenty to thirty minutes at a time, and being able to lift five to ten pounds. (*Id.* at 5) Plaintiff then returned to Dr. Downing on June 9 and June 23, 2009, and received injections in the L3-4 and L4-5 facet joints. Plaintiff reported a greater than fifty percent improvement following said procedures and was again referred to physical therapy. (*Id.* at 23-24)

---

[3] Plaintiff was prescribed Vicodin, Flexeril, and OxyContin. Vicodin is used to relieve moderate to severe pain. *See* http://drugs.com/vicodin.html (last visited Sept. 16, 2015). Flexeril is a muscle relaxant used together with rest and physical therapy to treat skeletal muscle conditions. *See* http://drugs.com/flexeril.html (last visited Sept. 16, 2015). OxyContin is used to treat moderate to severe pain that is expected to last for an extended period of time. *See* http://drugs.com/oxycontin.html (last visited Sept. 16, 2015).

3

On July 9, 2009, plaintiff began to see Nel Serafimova, M.D. ("Dr. Serafimova"), as her primary care physician. (*Id.* at 441). Dr. Serafimova wrote a letter stating plaintiff would need three months of disability due to low back and neck pain. (*Id.*) Plaintiff decided to apply for disability benefits and requested that Dr. Serafimova author a letter stating that plaintiff had been unable to work for the past year due to her neck and back pain. (*Id.* at 46) Dr. Serafimova informed plaintiff there was "no objective evaluation on chart about physical restrictions" and he could not make such a statement.[4] (*Id.*)

Plaintiff returned to St. Francis on August 12, 2009, and reported initial improvement but her pain had returned. (*Id.* at 50) Plaintiff stated she was unable to continue her course of treatment with physical therapy and injections because she lacked insurance; Dr. Serafimova renewed her prescriptions for OxyContin and Flexeril. (*Id.*) Plaintiff saw Dr. Serafimova again on October 15, 2009, stating her condition and pain had not improved. (*Id.* at 47) Dr. Serafimova referred plaintiff to chiropractic care and pain management specialists for her lower back and neck pain. (*Id.*)

Plaintiff underwent a second MRI on November 21, 2009, which showed mild to moderate stenosis of the spinal canal in the cervical region, evidence of the previous fusion from C3 through C6, mild degenerative changes at C3-4 and C6-7, focal areas of myelomalacia at C3-4 and C5-6, and no evidence of a herniated disc. (*Id.* at 33-34) Two days later, plaintiff saw Kennedy Yalamanchili, M.D. ("Dr. Yalamanchili"), the surgeon who previously operated on her spine in 2003. (*Id.* at 85) Dr. Yalamanchili noted plaintiff had good movement in her arms and leg, and her reflexes were intact and

---

[4] Dr. Serafimova noted plaintiff became "very upset" over the phone, shouting he was "insensitive to her pain." (D.I. 7-10 at 46)

symmetric. (Id.) Dr. Yalamanchili reviewed plaintiff's MRI results and considered her "a good candidate to exhaust conservative measures." (Id.) Dr. Yalamanchili considered plaintiff's dose of narcotics "tremendous" and recommended further assessment by a pain center and interventional pain management such as cervical and lumbar steroid injections. (Id.)

On December 17, 2009, plaintiff visited Bruce H. Grossinger, D.O. ("Dr. Grossinger"), and reported low back pain that radiated into her legs and feet, especially the left. (D.I. 7-11 at 19) Dr. Grossinger noted "lumbar spasm with loss of lordosis, grade 4/5 weakness of the tibialis anterior and gastrocnemius, and diminished Achilles reflexes." (Id.) Dr. Grossinger provided plaintiff with lumbar epidural injections and recommended continued injections and physical therapy. (Id.)

On December 23, 2009, a state agency physician, V.K. Kataria, M.D. ("Dr. Kataria"), reviewed plaintiff's medical records and evidence and opined plaintiff could perform sedentary work. (Id. at 59) Dr. Kataria found plaintiff could stand or walk up to two hours in an eight hour day, sit up to six total hours in an eight hour day, could occasionally stoop, kneel, or crouch, but could not climb any ladder, rope, or scaffold, could frequently lift or carry up to ten pounds, and should avoid concentrated exposure to vibrations and all exposure to hazards such as machinery and heights. (Id. at 59-65) A second state agency physician, Anne C. Aldrige, M.D. ("Dr. Aldrige"), reported no new impairments or limitations for plaintiff and affirmed Dr. Kataria's findings and opinions in a report dated March 3, 2010. (D.I. 7-13 at 40) On January 6, 2010, Frederick Kurz, Ph.D. ("Dr. Kurz"), evaluated plaintiff's mental health at the request of the agency. (D.I.

5

7-11 at 68) Dr. Kurz reported plaintiff's cognitive skills were intact, there was no evidence of a mood, thought, personality, or attention disorder affecting her performance, and plaintiff did not meet the criteria for a DSM-IV diagnosis. (Id. at 69-70) On January 8, 2010, Christopher King, Psy.D., reviewed the record and opined there was no evidence of any mental symptoms besides a brief mentioning of stress, and plaintiff did not have a medically determinable mental impairment. (D.I. 7-12 at 2-12) On March 9, 2010, Carlene Tucker-Okine, Ph.D., affirmed these findings. (D.I. 7-13 at 40)

EMG studies Dr. Grossinger performed on January 19 and February 2, 2010, revealed moderate left C6 and S1 radiculopathy. (Id. at 4, 14) Plaintiff received epidural injections from January through May 2010. (Id. at 17-37, D.I. 7-15 at 46) Dr. Grossinger documented on May 6, 2010, that plaintiff experienced eighty percent improvement from her second set of cervical facet injections. (D.I. 7-17 at 56) Plaintiff also reported temporary relief and feeling a little stronger with physical therapy. (D.I. 7-14 at 50, 52) In a letter dated March 18, 2010, Dr. Grossinger stated that, due to plaintiff's fall in January 2009, she aggravated her previous conditions and developed new conditions such as lumbar radiculopathy, numbness, and lumbar facet syndrome. (D.I. 7-15 at 43) Dr. Grossinger further stated that, despite narcotic medications, physical therapy, and steroid injections, plaintiff "has not experienced any relief to her condition." (Id.) Dr. Grossinger thus concluded that plaintiff was "unfit for gainful employment." (Id.)

6

On June 1, 2010, Dr. Grossinger completed a Spinal Impairment Questionnaire and indicated plaintiff had limitations inconsistent with the ability to work. (*Id.* at 33-39) Dr. Grossinger noted plaintiff's diagnoses of left S1 and C6 radiculopathy, shoulder tenosynovitis, numbness/paresthesia, cervical facet syndrome, and left shoulder strain. (*Id.*) Dr. Grossinger opined: plaintiff could sit for three to four hours, stand/walk up to one hour in an eight hour day, would have to get up and move around every forty-five minutes four to five times a day for approximately ten minutes at a time, could occasionally lift up to five pounds, could not push, pull, kneel, or stoop, was likely to miss work more than three times a month, would constantly experience pain or other symptoms severe enough to interfere with her attention and concentration, and had depression that caused psychological limitations and contributed to the severity of her symptoms and functional limitations. (*Id.*) In a subsequent office note dated June 8, 2010, Dr. Grossinger opined plaintiff was "permanently totally disabled from gainful employment." (D.I. 7-17 at 54)

On November 30, 2010, plaintiff returned to Dr. Grossinger for continued neck pain with radiation to the left shoulder and he referred her to Delaware Pain Management for additional physical therapy. (D.I. 7-15 at 58) On January 11, 2011, Dr. Grossinger performed an EMG study which revealed evidence of denervation in the left supraspinatus and infraspinatus muscles, as well as moderate left suprascapular neuropathy. (D.I. 7-17 at 22) On February 10, 2011, physical therapy discharged plaintiff after twelve sessions for having reached her maximum benefit. (D.I. 7-19 at 43) Dr. Grossinger continued to treat plaintiff with injections to provide her pain relief. (*Id.* at

7

63, 65) Radiofrequency of the cervical spine provided plaintiff with 100% relief of her symptoms for three weeks but she complained the pain eventually returned. (D.I. 7-17 at 39-40)

On May 25, 2011, plaintiff first consulted Allen Silberman, Ph.D. ("Dr. Silberman"), and complained of depression since the January 2009 fall. (D.I. 7-19 at 58) Dr. Silberman opined depression and anxiety were apparent through plaintiff's depressed mood, flat affect, and tearful demeanor. (*Id.* at 59) He also reported plaintiff was emotionally self-punitive and isolated, slept excessively, and had a decreased appetite. Dr. Silberman diagnosed plaintiff with an adjustment order mixed with anxiety and depression and recommended psychotherapy. (*Id.*) A few months later on September 21, 2011, Dr. Silberman completed a Psychiatric/Psychological Impairment Questionnaire. (*Id.* at 50-57) He confirmed the diagnosis of adjustment disorder with anxiety and depression and reported plaintiff's primary symptoms were anxiety, depression, attention and concentration difficulties, irritability, restlessness, mood swings, episodic short-term memory problems, and chronic pain. (*Id.* at 52) Plaintiff's GAF was 51-60.[5] (*Id.*) Dr. Silberman also stated that, as plaintiff's physical symptoms improve, so too will her level of emotional functioning. (*Id.* at 50)

---

[5] The GAF scale ranges from 0 to 100 and is used by a clinician to indicate his overall judgment of a person's psychological, social, and occupational functioning on a scale devised by the American Psychiatric Association. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* (Text Revision, 4th ed. 2000) (*DSM-IV-TR*). A GAF of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . .)." A GAF of 41-50 indicates "[s]erious symptoms (e.g.. suicidal ideation,

8

Plaintiff returned to see Dr. Silberman on December 14, 2011. (*Id.* at 67) Her mood and affect improved but she was visibly worried about the outcome of her Social Security decision. (*Id.*) She was motivated to work but felt overwhelmed by feelings of helplessness and hopelessness. (*Id.*) Dr. Silberman stated plaintiff was making an effort to overcome her physical and emotional difficulties, but was having "severe difficulties" with this process. (*Id.*) He opined it was unlikely plaintiff could function in a competitive work environment in the foreseeable future. (*Id.*)

### 3. Health history after the relevant time period[6]

In April 2012, plaintiff had corrective surgery on her left shoulder. (D.I. 7-2 at 113-14) As a result, any pain that she once had in this shoulder was resolved. (*Id.*)

_____

severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *Id.* A GAF of 61-70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

[6] Medical evidence after the relevant time period may be relevant to show a previous disability. *See e.g., Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988) ("medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition"); *Wooldridge v. Secretary of HHS*, 816 F.2d 157, 160 (4th Cir. 1987) ("medical evaluations made two years subsequent to expiration of insured status are not automatically barred from consideration and may be relevant to prove a previous disability"); *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984) ("medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status"); *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) (a diagnosis even several years after the actual onset of the impairment is entitled to significant weight); *Stark v. Weinberger,* 497 F.2d 1092, 1097 (7th Cir. 1974) (same).

Plaintiff fell again in August 2012 and herniated a disc in her neck, broke her right arm, and worsened her back pain. (*Id.* at 100) As a result of this fall, the pain in plaintiff's neck and back became constant. (D.I. 7-23 at 4) Plaintiff then underwent a course of treatment consisting of injections and physical therapy. (*Id.*) Her doctor warned, however, that if those continued to be unsuccessful, then surgery was her next option. (*Id.*) Plaintiff also continued to manage her pain with prescription medication. (D.I. 7-2 at 102)

On December 12, 2012, plaintiff underwent another EMG study. (D.I. 7-21 at 16) Results showed moderately severe, chronic, multi-level, right-sided cervical radiculopathies from C6 through C8. (*Id.*) On December 13, 2012, plaintiff had a spinal cord stimulator implanted and two leads were done bilaterally at the top of T6 spanning across T7. (D.I. 7-22 at 4) Plaintiff informed her doctors she did not notice any significant benefit, which she attributed to the dramatic worsening of her cervical radiculopathy and, thus, overall failed the spinal cord stimulator trial. (*Id.*)

Throughout this period, plaintiff continued to see Dr. Silberman for psychiatric treatment. On January 1, 2013, Dr. Silberman completed a second Psychiatric Impairment Questionnaire. (D.I. 7-21 at 18) Dr. Silberman opined that plaintiff had major depressive disorder and this diagnosis had changed because of the current severity of her symptoms. (*Id.*) He also stated that plaintiff's primary symptoms were feelings of helplessness and hopelessness, problems with attention and concertation, mood changes, and crying. (*Id.* at 20) Dr. Silberman opined that plaintiff's mental

10

activity was markedly limited, which effectively precludes the individual from performing activity in a meaningful manner. (*Id.*)

## C. Administrative Hearing

### 1. Plaintiff's testimony

Administrative hearings were held on December 10, 2010, and April 9, 2013. Plaintiff appeared, represented by counsel. (D.I. 7-2 at 51, 94) Plaintiff was born on September 4, 1963, and was forty-seven and forty-nine at the time of the hearings, respectively. (*Id.*) She is not married, does not have children, and lives alone. (*Id.* at 59) Plaintiff does her own cooking, laundry, light house cleaning, shopping, driving short distances, and can conduct her personal hygiene routine. (*Id.* at 79) She typically sleeps eight hours during any given night barring any pain. (*Id.* at 78)

Plaintiff has not worked since 2008. (*Id.* at 62) From 1985 to 2000, plaintiff worked for Ace American Insurance as an underwriting assistant, conducting office work. (*Id.* at 61-62) She then worked for UPS from 2001 to 2008, also doing clerical and administrative work. (*Id.* at 60) While working at UPS, plaintiff spent most of the day sitting, using a computer and telephone, and the heaviest thing she had to lift was a ream of paper. (*Id.*) Plaintiff received unemployment benefits in 2008 and 2009 after she was "relieved" of her job at UPS. (*Id.* at 62-63) At the time of the hearings, plaintiff was enrolled in online courses to receive her bachelor's degree in business administration. (*Id.* at 59) She did not take a full course load but, rather, one course a semester. (*Id.* at 64)

11

Plaintiff testified that pain in her neck, back, and shoulder impeded her life. (*Id.* at 65-66) In 2003 and 2005, plaintiff had cervical surgeries after being involved in motor vehicle accidents. (*Id.* at 65-66) While the first surgery in 2003 was successful, the surgery performed in 2005 did not help alleviate plaintiff's pain. (*Id.*) After losing her job in 2008, plaintiff stopped getting injections in her neck and was simply prescribed pain medication. (*Id.* at 67) By the time of the first hearing, plaintiff had once again resumed receiving pain injections for treatment. (*Id.* at 67-68)

Plaintiff testified that the pain in her neck, back, and shoulder "comes and goes" and she experienced pain roughly four days out of seven in any given week. (*Id.* at 68, 70, 72) She had not had any surgeries to correct the pain in her left shoulder and back. (*Id.* at 71-72) Plaintiff continued to receive injections in both her neck and back as well as participating in physical therapy. (*Id.*) Plaintiff testified that the pain in her neck and back, on a scale of one to ten, was a "seven or eight with medication, but a ten without medication." (*Id.* at 69, 73) Plaintiff also testified that the pain in her neck and back had not improved with treatment since her fall in 2009. (*Id.* at 69-70, 73)

To help the pain, plaintiff wore a back brace, used a TENS unit, and used both heat and ice packs. (*Id.* at 75) Also to help the pain, she took Methadone[7], Diclofenac[8], Vistaril[9], and Vicodin. (*Id.* at 68) As a result of these medications, she stated she

---

[7] Methadone is used to treat moderate to severe pain that is not relieved by other pain medicines. *See* http://drugs.com/methadone.html (last visited Sept. 16, 2015).
[8] Diclofenac is a nonsteroidal anti-inflammatory drug used to treat mild to moderate pain, or signs and symptoms of osteoarthritis or rheumatoid arthritis. *See* http://drugs.com/diclofenac.html (last visited Sept. 16, 2015).
[9] Vistaril reduces activity in the central nervous system and is used as a sedative to treat anxiety and tension. *See* http://drugs.com/vistaril.html (last visited Sept. 16, 2015).

experienced side effects such as dizziness, drowsiness, constipation, and dry mouth. (*Id.* at 74-75)

Plaintiff testified that she could use stairs, stand up to twenty minutes, sit up to thirty minutes, lift up to five pounds, kneel, stoop over, and had no problem using her hands. (*Id.* at 76-77) She also stated that she did not have any problem with her memory, concentration, or breathing. (*Id.* at 77-78) However, on a "bad day," she was not capable of doing anything except rest until the pain subsides. (*Id.* at 84)

In the second hearing, plaintiff testified that due to her August 2012 fall and injuries, the pain in her neck and lower back became constant. (*Id.* at 101) She continued to treat the pain with physical therapy, injections, and pain medication. (*Id.*) Plaintiff also began to see Dr. Silberman weekly for her depression and anxiety. (*Id.* at 102, 104-05) She testified she then woke up at three a.m. every morning because the pain interrupted her sleep. (*Id.* at 107) She felt "mentally and physically tired," and could no longer conduct the tasks she once did due to her depression. (*Id.* at 109-10)

### 2. VE's testimony

At the first hearing, the VE testified that, according to plaintiff's testimony, plaintiff had worked as a secretary, which is at a sedentary exertional level, skilled with a special vocational preparation ("SVP") of 6. (*Id.* at 86) The VE opined the secretarial position has transferable skills.

The ALJ posed the following to the VE:

Now, we will consider a hypothetical person who is... about 45 years (old)... has a 12th grade education along with a two year college degree... is able to read, write, and do at least simple math adding and subtracting... this individual has certain underlying impairments that place

13

limitations on the ability to do work related activities. We'll start with basically a sedentary level of exertion, postural standing and walking about two hours in an eight hour work day, sitting about six. While there are no sit/stand limitations in the DOT, this person would require the ability to do an office job where a person can get up at pretty much any time. So a sit/stand option in general, pushing and pulling with the lower extremities and left arm, as well as working overhead, should be generally avoided, and this person would have all of the posturals occasionally but no climbing of a ladder, rope, or scaffold…and should avoid concentrated exposure to extreme cold, vibration, and hazards. In your opinion, with that hypothetical, could such a person do the claimant's past relevant work?

(*Id.* at 86-87) The VE responded: "Based on your description of the types of times that

the person can get up and yes, the answer would be yes (for both jobs)." (*Id.* at 87)

The ALJ additionally asked the VE: "And let's say there were additional limitations to

simple, unskilled work, would there be any simple unskilled work at a sedentary level of

exertion, if you can identify several at a sedentary level of exertion?" (*Id.*) The VE

responded:

Yes there would. There are some assemblers of a variety of different products representing several different DOT titles and codes. In the region there are roughly 2,000 and roughly 120,000 nationally. There are some packers, again representing several DOT titles at about 200 regionally and 15,000 nationally. There are some cashiers, the DOT does not determine any sedentary cashiers because the vast majority are light but there are a small percentage of unskilled cashiers that are found at sedentary and sit, stand at will is typical. There are approximately 2,500 in the region and about 200,000 nationally.

(*Id.* at 87-88) The ALJ asked: "And the positions that you cited me to, are they

consistent with those in the DOT or companion publications?" The VE responded: "Yes,

with my explanation about the cashier." (*Id.*)

On cross-examination, plaintiff's counsel asked the VE if the number of cashier

positions that allow sitting or standing at will accounts for the erosion for the sit/stand

14

option. The VE answered it did, and "there are approximately an additional 30,000 cashiers in the region that do not allow for that." (*Id.*) Plaintiff's counsel also asked the VE what jobs "an individual who was limited to sitting a maximum of four hours in an eight hour day, standing/walking a maximum of one hour, who could lift five pounds, and who would be absent from work more than three times a month" could perform. The VE responded these factors would preclude sustaining any work activity for the particular individual. (*Id.* at 89)

At the second hearing, a different VE testified. The ALJ informed the VE about the previous hypothetical posed to the first VE. (*Id.* at 120-21) Plaintiff's attorney then asked the VE "if an individual, in addition to being limited to sedentary, unskilled work, had those limitations as noted in the psychological impairment questionnaire[10] would that individual be able to maintain any job at the SGA level?" (*Id.* at 122) The VE responded:

> No, the limitations indicated in this exhibit particularly the marked limitation on the person's ability to maintain attention and concentration for extended periods as well as the mark[ed] limitation for the person to be able to complete a normal work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. I believe that those two limitations, particularly would certainly reduce the person's productivity by fifteen to twenty percent or more and would be work preclusive and there's also an indication that the person would have absences of more than three days per month and that number of absences certainly would be considered excessive by the employer and also would be work preclusive.

(*Id.*)

## D. The ALJ's Findings

---

[10] Psychological Impairment Questionnaire completed by Dr. Silberman on September 21, 2011, *supra*.

15

Based on the factual evidence and the testimony of plaintiff and the VEs, the ALJ

determined plaintiff was not disabled during the relevant time. The ALJ's findings are

summarized as follows:[11]

1. [Plaintiff] met the insured status requirements of the Social Security Act through December 31, 2013.

2. [Plaintiff] has not engaged in substantial gainful activity since the alleged onset date of January 25, 2009 (20 C.F.R. §§ 404.1571 et seq.).

3. [Plaintiff] has had the following severe impairments since the amended alleged onset date of disability, January 25, 2009: injuries to neck and back (20 C.F.R. 404.1520(c)).

4. Since the alleged onset date of disability, January 25, 2009, [plaintiff] has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, prior to August 1, 2012, the date [plaintiff] became disabled, [plaintiff] had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.976(a) except she is afforded the opportunity to sit/stand at will; pushing and pulling with the lower extremities and left arm should be generally avoided, as should working overhead; postural are limited to occasional but no climbing of a ladder, rope, or scaffold; and should avoid concentrated exposure to extreme cold, vibrations, and hazards.

6. After careful consideration of the entire record, [prior to] August 1, 2012, [plaintiff] had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she is limited to lifting and carrying up to ten pounds occasionally; no bending or twisting; should allow for frequent position changes; can sit up to seven hours total; stand/walk a total of twenty minutes in an eight-hour workday; and should avoid repetitive reaching.

---

[11] The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

7. Prior to August 1, 2012, [plaintiff] was capable of performing past relevant work as a secretary. This work did not require the performance of work-related activities precluded by [plaintiff's] residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

8. Beginning on August 1, 2012, [plaintiff's] residual functional capacity prevented [plaintiff] from being able to perform past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

9. [Plaintiff] was a younger individual age 45-49 on August 1, 2012, the established disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

10. [Plaintiff] has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.15654 and 416.964).

11. [Plaintiff] does not have work skills that are transferable to other occupations within the residual functional capacity defined above (20 C.F.R. §§ 404.1568 and 416.968).

12. Since August 1, 2012, considering [plaintiff's] age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c), and 416.966).

13. [Plaintiff] was not disabled prior to August 1, 2012, (20 C.F.R. §§ 404.1520(f) and 416.920(f)) but became disabled on that date and has continued to be disabled through the date of the decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

(D.I. 7-2 at 26-39)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are

conclusive if they are supported by substantial evidence. See 42 U.S.C. §§ 405(g),

1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether

"substantial evidence" supports the decision. See Monsour Med. Ctr. v. Heckler, 806

F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not

undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190–91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250-51 (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the

18

substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520.

The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. Pt. 404, Subpt. P, App. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity[12] to perform his past work. If the claimant cannot perform her past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel,* 228 F.3d 259, 262–63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the

---

[12] A claimant's residual function capacity ("RFC") is "that which an individual is able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari,* 247 F.3d 34, 40 (3d. Cir. 2001).

20

nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2), (3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

On June 24, 2013, the ALJ found plaintiff was not under a disability within the meaning of the Act during the relevant time period from the alleged onset date of January 25, 2009, to August 1, 2012. The ALJ concluded that, despite plaintiff's "severe" impairment (injuries to the neck and back), she had the residual functional capacity to perform a range of sedentary work such as her past relevant work as a secretary. After considering the VE's testimony, the ALJ found that as of August 1, 2012, plaintiff's residual functional capacity prevented her from being able to perform past relevant work and there are no other jobs that exist in significant numbers in the national economy plaintiff can perform.

Plaintiff contends: (1) her condition satisfies the requisite severity level of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (2) the ALJ erred in according little weight to Dr. Grossinger's opinions, plaintiff's treating physician during the relevant time, and failed to properly weigh the physical medical evidence; (3) the ALJ erred in finding plaintiff did not have severe mental impairments; and (4) the ALJ failed to properly evaluate plaintiff's credibility. (D.I. 10 at 6) Defendant disagrees and

contends that substantial evidence supports the ALJ's decision that plaintiff was not disabled under the Act during the relevant time. (D.I. 14 at 6-7)

## 1. Severity requirements for Medical Listing 1.04A

On appeal, plaintiff argues that the ALJ erred in finding plaintiff does not meet the severity requirements for Medical Listing 1.04A. (D.I. 10 at 14-15) Specifically, plaintiff contends that when the ALJ found plaintiff did not meet Medical Listing 1.04A (because there was no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limited motion in the spine, motor loss accompanied by sensory or reflex loss, and no positive straight leg raising tests), the ALJ failed to cite to a single finding in the record to support this conclusion and "the ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis or his finding." (*Id.* at 15) (quoting *Schaudeck v. Commissioner of Soc. Sec.*, 181 F.3d 429, 433 (3d. Cir. 1999)).

While there is no question plaintiff has disorders of the spine, this alone does not mean plaintiff meets the severity requirements of Medical Listing 1.04A. In order to meet a listing, plaintiff must show that all of the criteria of that listing are met. "Meeting only some criteria of a listing, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (citations omitted). Listing 1.04A requires:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by

22

> sensory or reflex loss and, if there is involvement of the lower back,
> positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04A. Plaintiff has not met the burden of proving she meets Listing 1.04A. In her opinion, the ALJ states MRIs of the lumbar spine evidenced mild degenerative change, disc bulge, mild to moderate stenosis of the spinal canal in the cervical region, and no disc herniation. (D.I. 7-2 at 33-34) There is no evidence of nerve root or spinal cord compromise. (*Id.* at 31) An EMG performed by Dr. Grossinger revealed motor nerve analysis, late response, and sensory nerve analysis to be normal and symmetric. (*Id.* at 34) Additionally, while Dr. Downing noted reduced motion in the cervical spine, he also found plaintiff had an equivocal leg-raising test as well as full strength and sensation. (D.I. 7-10 at 20-21, 25) Plaintiff's range of motion was within normal limits in all ranges. (D.I. 7-2 at 34) Finally, plaintiff's mere mention of radiating pain is insufficient to show evidence of a neuro-anatomic distribution of pain and there is no medical evidence of such. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00 K.1. Thus, the court finds substantial evidence supports the ALJ's conclusion that plaintiff's condition does not satisfy the requisite severity level of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

## 2. Weight of medical opinions and medical evidence

Plaintiff argues that the ALJ failed to properly weigh the medical opinions of Dr. Grossinger (plaintiff's treating physician during the relevant time) and the physical medical evidence. (D.I. 10 at 16-17) Plaintiff claims the ALJ rejected Dr. Grossinger's testimony and instead based her conclusion improperly upon her "own credibility judgments, speculation or lay opinion." (*Id.* at 20) (quoting *Morales v. Apfel,* 225 F.3d at

23

317–18). Generally, the weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). To that end, the more consistent an opinion is with the record as a whole, the more weight is given to that opinion. 20 C.F.R. § 404.1527(c)(4).

A treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2); *Fargnoli v. Massanari,* 247 F.3d 34, 42 (3d Cir. 2001). The more a treating source presents medical signs and laboratory findings to support his/her medical opinion, the more weight it is given. *Id.* Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.* An ALJ may only outrightly reject a treating physician's assessment based on contradictory medical evidence or a lack of clinical data supporting it, not due to his or her own credibility judgments, speculation or lay opinion. *Morales v. Apfel,* 225 F.3d at 318; *Lyons– Timmons v. Barnhart,* 147 Fed.Appx. 313, 316 (3d Cir. 2005).

Even when the treating source opinion is not afforded controlling weight, it does not follow that it deserves zero weight. Instead, the ALJ must apply several factors in determining how much weight to assign it. *Gonzalez v. Astrue,* 537 F.Supp.2d 644, 662 (D. Del. 2008). These factors include: (1) the treatment relationship, including the length of the relationship and the nature and extent of the relationship; (2) supportability; (3) consistency; (4) specialization; and (5) other factors. 20 C.F.R. § 404.1527(c)(2)-(6).

24

Considering this authority against the instant record, the court finds that the ALJ did not err in affording Dr. Grossinger's opinions little weight. The ALJ correctly found that the record does not indicate difficulty with ambulation; objective testing reveals only mild findings; treatment remains limited to medication and physical therapy; and plaintiff continues to live alone and perform a variety of daily activities. (D.I. 7-2 at 36) Despite Dr. Grossinger opining that plaintiff had permanent restrictions, he continued to recommend only conservative treatment. (Id.) Likewise, Dr. Downing and Dr. Yalamanchili both recommended conservative treatment with chiropractic care, injections, and physical therapy. (D.I. 7-10 at 21, 84) Further, the record demonstrates that plaintiff's symptoms improved from such conservative treatments. (D.I. 7-10 at 23-24; D.I. 7-17 at 56) Finally, Dr. Grossinger's opinion that plaintiff was "permanently totally disabled from gainful employment" is not entitled to controlling weight. (D.I. 7-17 at 54) The Commissioner's regulations explain that medical source opinions that a claimant is "disabled" or "unable to work" is not a medical opinion and is not given special significance because opinions as to whether or not a claimant is disabled are reserved for the Commissioner. 20 C.F.R. § 404.1527(d). The court finds substantial evidence supports the ALJ's decision to assign less than controlling weight to Dr. Grossinger's testimony, for it is inconsistent with the record as a whole and thus lacked consistency and supportability.

Moreover, the ALJ did not improperly weigh the physical medical evidence when concluding plaintiff could perform a limited range of sedentary work. State agency physicians Dr. Kataria and Dr. Aldrige determined that plaintiff had the residual

25

functional capacity to perform the exertional demands of light wok, with limited push/pull in the lower extremities, occasional postural limitations but no climbing of a ladder, rope, or scaffolds, and should avoid concentrated exposure to vibration and all exposure to hazards. (D.I. 7-2 at 35) In her decision, the ALJ noted the restrictions imposed by Drs. Kataria and Aldrige but found plaintiff's exertional capacity to be more limited than what they assessed, giving plaintiff "every benefit of the doubt" and considering her past relevant work, medication side effects, and recent treatment records. (Id.) The court finds substantial evidence supports the ALJ's RFC assessment and, therefore, the ALJ did not improperly weigh the medical evidence.

To the extent plaintiff asserts that the ALJ did not consider all relevant evidence, the Third Circuit has not required the ALJ to discuss or refer to every piece of evidence of the record, so long as the reviewing court can discern the basis of the decision. *Fargnoli*, 247 F.3d at 42. The ALJ at bar stated that she considered all the evidence of record. *See Black v. Apfel,* 143 F.3d 383, 386 (8th Cir. 1998) (the mere failure to cite to specific evidence does not establish that the ALJ failed to consider it); *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (the ALJ need not evaluate in writing every piece of evidence submitted). Having considered the ALJ's decision, it is evident that she considered all the record evidence and provided sufficient reasons for the court to discern her decision.

### 3. Plaintiff's mental impairments

Next, plaintiff contends that the ALJ improperly found her mental impairments not severe. Specifically, the ALJ erred in giving Dr. Silberman's opinion little weight. To

26

reach her conclusion that plaintiff does not have any severe mental impairments, the ALJ assessed functional limitations using the four broad functional areas set out in the disability regulations for evaluating mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C); (*Id.* at 31). To find a "marked" limitation, it must be more than moderate but less than extreme and the degree of limitation is such as to interfere seriously with the ability to function independently, appropriately, effectively, and on a sustained basis. *Id.*

First, with respect to a marked restriction in activities of daily living, the ALJ found plaintiff has a mild limitation.[13] (D.I. 7-2 at 30) The ALJ based her finding primarily upon plaintiff's own testimony and statements. Plaintiff testified she lives alone, prepares her own meals, vacuums once a month, does limited cleaning, can make her bed, do laundry, go to the store, and drive short distances. (*Id.* at 78-79) The court finds that substantial evidence supports the ALJ's conclusion that plaintiff did not exhibit marked restriction in activities of daily living.

Second, the ALJ found a mild limitation in social functioning.[14] (*Id.* at 30) Initiating social contact with others, communicating clearly with others, or interacting and actively participating in group activities are indicative of strength in social functioning. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2). Plaintiff testified

---

[13] According to the Social Security regulations, "activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1).

[14] According to the Social Security regulations, "social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." *Id.* at § 12.00(C)(2).

she attends church in Philadelphia, which requires almost an hour's drive, and thus socializes and participates with others. (D.I. 7-2 at 30) The court finds there is substantial evidence that supports the ALJ's finding that plaintiff's restriction in social functioning was only mild.

Third, the ALJ found that plaintiff has only a mild limitation in the functional area of concentration, persistence, or pace.[15] (*Id.*) Plaintiff testified that she is able to pay her own bills, enjoys reading and watching movies, and is enrolled in an online bachelor's degree program and spends part of her day doing homework and assignments. (*Id.* at 30-31) The court finds that substantial evidence supports the ALJ's conclusion that plaintiff did not exhibit marked restriction in concentration, persistence, or pace. Finally, the ALJ found no episodes of decompensation which have been of extended duration.[16] (*Id.* at 31) The ALJ noted there is no evidence of any episodes of decompensation during the relevant time period. (*Id.* at 31)

Because plaintiff's medically determinable mental impairments cause no more than "mild" limitations in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, the ALJ properly found them nonsevere. (*Id.*) Plaintiff argues the ALJ erred in assigning little

---

[15] According to the Social Security regulations, "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Id.* at § 12.00(C)(3).

[16] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace... and ordinarily requires increased treatment or a less stressful situation (or a combination of the two)." *Id.* at § 12.00(C)(4).

28

weight to the opinions of plaintiff's treating psychologist, Dr. Silberman. However, the ALJ accorded little weight to these opinions because they are not supported by the record. Dr. Silberman noted only mildly impaired attention and concentration and no difficulties with memory functions. (*Id.* at 30) Further, when clearing plaintiff for a spinal cord stimulator, Dr. Silberman noted plaintiff had hope for the future, there was no impairment of thought content, and her thought processes were well organized; he recommended her for the procedure because she had a good overall level of functioning and was emotionally stable. (*Id.*) The court finds there is substantial evidence to support the ALJ's finding that plaintiff's mental impairments are nonsevere.

### 4. Plaintiff's credibility

Finally, plaintiff argues the ALJ failed to properly evaluate her credibility within the RFC evaluation.[17] The ALJ concluded that plaintiff had the ability to perform sedentary work activities with the limitations set forth despite her impairments. (*Id.* at 36) In reaching this conclusion, the ALJ adhered to a two-step process for evaluating the symptoms of plaintiff's mental impairments. (*Id.* at 31; *see* SSR 96–7p) First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) ... that could reasonably be expected to produce the individual's pain or other symptoms. *See* SSR 96–7p. Second, the ALJ

> must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not

---

[17] Because the ALJ concluded that plaintiff's mental impairments neither meet nor are equivalent in severity to any listing, she proceeded to assess plaintiff's RFC. *See* 20 C.F.R. § 404.1520a(d)(3).

29

substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

*Id.*

The ALJ found there are medically determinable impairments that could reasonably produce plaintiff's symptoms, but plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible prior to August 1, 2012." (D.I. 7-2 at 34-35) The ALJ noted a number of inconsistencies between plaintiff's testimony and the record. (*Id.*) Plaintiff contends that the ALJ's credibility determination is insufficient. (D.I. 10 at 23)

An ALJ must give great weight to a claimant's testimony only "when this testimony is supported by competent medical evidence," and an ALJ may "reject such claims if [s]he does not find them credible." *Schaudeck,* 181 F.3d at 433. The ALJ "has the right, as the fact finder, to reject partially, or even entirely, such subjective complaints if they are not fully credible." *Baerga v. Richardson,* 500 F.2d 309, 312 (3d Cir. 1974).

The ALJ at bar found treatment records that noted plaintiff's lost job was due to cutbacks unrelated to her pain complaints, but plaintiff testified she stopped working due to pain. (D.I. 7-3 at 35) The ALJ noted that plaintiff has a history of chronic neck and shoulder pain and was treated with pain management and physical therapy well before the amended alleged onset date. (*Id.*) Further, discharge records from St. Francis Hospital only indicated cervical strain. (*Id.*) The ALJ also took note of plaintiff's request for a letter stating that she had not been able to work for a year and her physician's refusal to provide such a letter because of insufficient evidence related to plaintiff's

physical abilities. (*Id.*) Finally, the ALJ found the objective evidence minimal, there is no indication plaintiff requires an assistive device to ambulate, treatment remains conservative in nature, and plaintiff continues to live alone and perform a variety of daily activities. (*Id.*)

With respect to these findings, plaintiff argues that the "Third Circuit has downplayed the significance of minimal activities performed by a claimant as evidence that can refute credible medical evidence of disability." (D.I. 14 at 18) (citing *Frankenfield v. Bowen,* 861 F.2d 405, 408 (3rd Cir. 1988)). However, plaintiff misapplies *Frankenfield.* The ALJ did not cite plaintiff's activities in order to refute credible medical evidence of disability; rather, she highlighted these activities as evidence of the inconsistencies in plaintiff's testimony. The ALJ did not err in finding that these inconsistencies negatively impacted plaintiff's credibility. The court finds there is substantial evidence supporting the ALJ's finding that plaintiff's testimony was "not entirely persuasive." (D.I. 7-2 at 36)

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment will be granted and plaintiff's motion for summary judgment will be denied. An appropriate order shall issue.

31